## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR ORION BANK OF NAPLES, FLORIDA<br><br>　　　　　Plaintiff,<br><br>v.<br><br>JAMES AULTMAN, EARL HOLLAND, ALAN PRATT, AND BRIAN SCHMITT,<br><br>　　　　　Defendants. | CASE NO. |

## COMPLAINT FOR RECOVERY OF DAMAGES AND DEMAND FOR JURY TRIAL

This civil action is instituted by Plaintiff Federal Deposit Insurance Corporation ("Plaintiff" or the "FDIC"), in its capacity as Receiver (the "FDIC-R") for Orion Bank of Naples, Florida ("Orion" or the 'Bank"), to recover damages against, individually, James Aultman ("Aultman"), Earl Holland ("Holland"), Alan Pratt ("Pratt"), and Brian Schmitt ("Schmitt") (collectively, the "Defendants"). Plaintiff shows as follows:

## PRELIMINARY STATEMENT

1.　　This is a civil action against four former directors of Orion for their gross negligence and breaches of fiduciary duties of care and loyalty that each owed to the Bank.

2.　　Orion failed on November 13, 2009 with over $2.6 billion in assets, causing a substantial loss to the Deposit Insurance Fund currently estimated at approximately $880 million. The Bank collapsed under the weight of the unsustainable growth strategy that the Defendants permitted Chief Executive Officer Jerry Williams ("Williams") to pursue. This strategy centered on the accumulation of high concentrations of commercial real estate and acquisition, development, and construction loans. Remarkably, the Defendants continued to commit the

Bank to this strategy even after the real estate market began to decline. In essence, the Defendants bet the Bank's survival on the proposition that real estate values would never fall, and then doubled down repeatedly once those values were already sinking.

3.     Williams was able to drive the Bank into failure with his reckless growth strategy largely because the Defendants never made more than token attempts to monitor, supervise and restrain him. Unrestrained by the Defendants, Williams assumed virtually complete control over the Bank's decision-making. The Defendants ultimately reinforced Williams's dominance by engaging in an uninterrupted pattern of unconsidered acquiescence to his proposals during the years leading up to the Bank's ultimate demise. Their unwillingness to inform themselves about and/or exercise meaningful oversight over Williams's performance was so apparent that Williams eventually began boasting to other Bank employees that the Defendants would never reverse his decisions.

4.     Each of the Defendants also had, as members of the Bank's Board Loan Committee ("BLC"), a duty to diligently review and independently evaluate proposed loans. Instead of conducting such a review and evaluation, the Defendants mechanically approved any loan that Williams proposed without meaningful deliberation or discussion. The Defendants even often approved extremely large and complex loans after less than four minutes of review and discussion, making clear that the Defendants habitually approved loans after only the most cursory review.

5.     The FDIC plays a critical role in safeguarding the stability of the nation's financial system. By insuring bank deposits, the FDIC protects banks against the ruinous bank panics and runs that once plagued the national banking system, and protects bank customers from losing most or all of their life savings in bank failures. As a necessary consequence, the

FDIC must absorb all the losses that would otherwise fall on ordinary citizens. Recognizing that it is the FDIC that suffers losses when a board of directors grossly mismanages a bank to the point of failure, Congress sensibly vested the FDIC with the power and duty to hold those individuals responsible.

6.      The FDIC-R seeks to recover damages in excess of $53 million for losses incurred by Orion as a result of the breaches of fiduciary duties and gross negligence of the Defendants. The claims against the Defendants are based on (1) their grossly negligent failure to inform themselves about and to exercise adequate oversight over the Bank's lending as directors after August 20, 2008; (2) their grossly negligent failure to inform themselves about and to exercise due care and business judgment in evaluating the risks of loans prior to approving such loans as members of the BLC. These acts and omissions damaged the economic value of the Bank, which was exemplified by losses the Bank incurred in connection with its principal business of lending.

## PARTIES

### Plaintiff

7.      The FDIC is a corporation organized and existing under the laws of the United States of America. 12 U.S.C. § 1811, *et. seq.* The FDIC is an instrumentality of the United States of America and is charged with, among other duties, the orderly liquidation of failed banks. 12 U.S.C. § 1821(d). Orion was chartered as a Florida bank and was a Federal Reserve Member. On or about November 13, 2009, the Florida Office of Financial Regulation ("FOFR") closed Orion and the FDIC-R was named receiver. Pursuant to 12 U.S.C. § 1821(d)(2)(A)(I), the FDIC-R succeeded to all rights, titles, powers, and privileges of Orion and its depositors, accountholders, other creditors, and stockholders, including, but not limited to, any claims

against its former directors and officers for gross negligence and breaches of fiduciary duties or other legal duties.  12 U.S.C. § 1821(d)(2)(A)(i).

Defendants

8.     Defendant Aultman was a director of Orion from 1992 until the Bank failed.  At all relevant times, he was also a member of the Bank's BLC.  Upon information and belief, Aultman resides in Marathon Beach, Florida.

9.     Defendant Holland was a director of Orion from 1987 until the Bank failed.  At all relevant times, he was also a member of the Bank's BLC.  Upon information and belief, Holland resides in Fort Myers, Florida.

10.     Defendant Pratt was a director of Orion from 1995 until the Bank failed.  At all relevant times, he was also a member of the Bank's BLC.  Upon information and belief, Pratt resides in Vero Beach, Florida.

11.     Defendant Schmitt was a director of Orion from 1997 until the Bank failed.  At all relevant times, he was also a member of the Banks' BLC.  Upon information and belief, Schmitt resides in Marathon, Florida.

<strong>JURISDICTION AND VENUE</strong>

12.     This Court has subject matter jurisdiction over this matter, as actions in which the FDIC-R is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, *et. seq.*; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. § 1331 and 1345.  The FDIC-R has the power to sue and complain in any court of law.  12 U.S.C. § 1819.

13.     This Court has personal jurisdiction over all of the Defendants, who at all relevant times were residents of, and conducted the business of Orion in, Florida.

14.     Venue is proper in this District under 28 U.S.C. § 1319(b), as all or substantially all of the events and/or omissions giving rise to the claims asserted herein occurred in this District.

## DEMAND FOR JURY TRIAL

15.     Pursuant to Federal Rule of Civil Procedure 38(b)(1), the FDIC-R demands a jury trial on all issues so triable.

## FACTUAL ALLEGATIONS

### I.     The Defendants Submit Completely to Chief Executive Officer Jerry Williams

16.     Orion was established on February 28, 1977, as the First National Bank of Marathon, and renamed as the First National Bank of the Florida Keys in 1982.  In 2002, the Bank moved its headquarters to Naples and was renamed as Orion Bank.  Orion had 23 branches, all of which were located in Florida.

17.     In 1987, Williams became the Bank's Chairman of the Board, President, and Chief Executive Officer.  As members of the Board, the Defendants were charged with a duty to supervise and oversee Williams's management of Orion, and entrusted with the authority to restrain him.  By 2004, the Defendants had permitted Williams to become the clearly dominant decision-maker for the Bank.  Content to commit the Bank's decision-making entirely to Williams's unfettered discretion, the Defendants generally approved any and all of Williams's proposals after little, if any, scrutiny.  With no objection from the Defendants, Williams also reinforced his own dominance and ensured his central role in virtually every Bank decision of any consequence by discouraging direct communication between his subordinates.  As a result, Bank personnel soon understood that Williams's decisions were final and could not be overruled, and those who challenged or questioned those decisions swiftly found themselves marginalized.

Far from acting as a check on Williams, the Defendants made Williams's authority so absolute that one Bank officer even characterized Orion as a "dangerously cultish environment."

18.     Each of the Defendants was also a member of the Bank's BLC.  BLC approval was required for all loans that exceeded 15 percent of the Bank's capital.  As members of the BLC, the Defendants had the duty to personally examine, analyze, and evaluate these loans to ensure that appropriate credit and risk management standards were applied to the biggest - and therefore most important and potentially dangerous - loans.  But instead of taking those duties seriously, the Defendants blithely rubberstamped any loan that Williams proposed without meaningful review or deliberation.

19.     Remarkably, the Defendants ignored their duties as BLC members even after the Bank entered into a Written Agreement on August 25, 2008, with the Federal Reserve Bank ("FRB") of Atlanta, the Bank's primary federal regulator, and with the FOFR, the Bank's primary state regulator.  Significantly, the Written Agreement was particularly concerned with improving the Defendants' oversight over the Bank, especially with respect to improving the Bank's asset quality.  Consequently, the Written Agreement specifically required the Defendants to approve and justify in writing any loan to any borrower that had an outstanding loan with the Bank that had been even partly charged off or adversely classified by regulators.  The Written Agreement even required the Defendants to certify that any such loan that was not "necessary to protect the Bank's interest in the ultimate collection of the credit already granted" had been extended "in full compliance with the Bank's written loan policy," and that "all necessary loan documentation [for such loan] ha[d] been accurately prepared and filed."

20.     In other words, after August 25, 2008, the Defendants were anything but ordinary members of an ordinary BLC.  By that date, the Defendants had been specifically and explicitly

warned by regulators that they had thus far failed to adequately oversee the Bank's lending, and had also been specifically and explicitly required by regulators to be personally and directly involved in reviewing, analyzing, and independently evaluating loans presented for approval.

21.    In or around October 2009, the Defendants were asked if the BLC had ever refused to approve a loan.  Remarkably, and notwithstanding the specific obligations required of them in the Written Agreement, none of them could recall a single example of the BLC withholding approval even though each had been approving loans as members of the BLC for over a decade.  Two of the Defendants actually affirmatively stated that the BLC had never rejected a loan request from Williams, and Defendant Holland frankly admitted that BLC approval was effectively a foregone conclusion.

22.    The Defendants' passivity did not escape Williams's notice.  Their lack of supervision over Williams was so transparent that Williams boasted to other Bank officers that the Defendants would approve whatever he wanted.  In short, the Defendants reduced the critical oversight role of the Board of Directors to an empty formality.

## II.    The Defendants Permit Williams to Pursue Aggressive Growth and Ignore Risk Management

23.    By 2004, the Defendants had permitted Williams to institute an aggressive growth strategy for Orion that centered on rapidly expanding the Bank's commercial real estate ("CRE") and acquisition, development and construction ("ADC") lending.  CRE loans are loans secured by real property used for commercial purposes.  Such loans are inherently risky because they are often extended to developers, builders, and land speculators.  The incomes of these types of borrowers are typically highly vulnerable to fluctuations in real estate values.  Because real estate prices, especially in Florida, have historically risen and fallen in regular cycles, principles

of prudent lending dictate that bank directors and managers recognize and prepare their

institution to survive the eminently foreseeable risks from fluctuations in the real estate market.

24.     ADC loans, a subset of CRE loans, are loans intended to fund the acquisition and

subsequent development of commercial real estate.  These loans typically finance not only the

purchase price of the land, but also subsequent construction of roads, residences, or commercial

projects.  Such loans are even riskier and more vulnerable to real estate market fluctuations than

typical CRE loans because the subject development projects (and prospects for repayment of the

loan) are themselves much more sensitive to real estate prices.

25.     The Defendants and Williams ignored the obvious inherent risks from CRE and

ADC loans, and continued to center the Bank's growth strategy on accumulating more of those

types of loans.  Moreover, they implemented this strategy with an overt indifference to credit risk

and proper underwriting that was reflected in numerous loans extended by Orion during this time

period.

A.      The Defendants Ignore Proper Underwriting Standards, Including the Bank's
        Written Loan Policy

26.     Unfortunately for the Bank, the Defendants had turned its future over entirely to

the judgment of an individual in which a singular focus on growth was disastrously paired with a

total disregard for proper risk management and the Bank's stability.  As directors, the Defendants

had a responsibility to ensure that Orion's lending complied in practice with the Bank's written

loan policy, which was designed to control the Bank's credit risk.  This policy required that loans

be supported by, *inter alia*, sources of repayment and sufficient assets and net worth to justify

any extension of credit, verified financial statements, and personal guarantees from principals of

borrowers that were closely held entities. The policy also required that lines of credit be extended

only for specific purposes and with limitations on the use of proceeds, and prohibited interest

reserves on non-income producing loans. Many loans extended while the Defendants were responsible for the proper management of the Bank, including the specific loss loans detailed below, violated one or more of these requirements.

27. The Bank extended loans based on obviously deficient underwriting because the Defendants permitted and preserved a structurally deficient lending process at the Bank even though, as detailed below, regulators repeatedly criticized the Bank's underwriting. Contrary to basic principles of prudent lending, the Bank operated without an independent Chief Credit Officer until the middle of 2009, well after the Bank's lending had peaked. The absence of a Chief Credit Officer who was independent of the Bank's loan production created obvious conflicts of interest in the Bank's lending decisions. Those individuals responsible for controlling the Bank's credit risk were either also loan producers charged with increasing the Bank's lending, or were ultimately subject and subordinate to those loan producers. In other words, the Defendants structured the Bank to explicitly prioritize aggressive loan growth over long-term stability.

28. The Defendants also permitted Williams to shape the Bank's lending culture around his philosophy of deliberately seeking to maximize loan amounts to the extent possible. Williams justified encouraging this dangerous practice on the grounds that larger loans were more "efficient" because the Bank expended about the same amount of resources to make smaller loans as it did larger loans. This thin rationalization was telling, as it completely ignored the fact that larger loans inherently represented greater and less diversified risk for the Bank. It was also entirely consistent with the myopic focus on growth and lack of concern for risk management that the Defendants permitted to drive the management of the Bank.

B.     The Defendants Ignore Concentration Risk

29.     The Defendants also failed to institute any effective concentration risk management measures to protect the Bank from the rapid escalation in its CRE and ADC loan concentrations. Between 2004 and 2006, Orion's portfolio of CRE and ADC loans doubled from approximately $720 million to nearly $1.5 billion. In 2005 and 2006, the Bank's loan growth was 41 percent and 32 percent respectively. By the end of 2006, the Bank's CRE loans were nearly 740 percent of its risk-based capital, a figure 80 percent higher than the average for Orion's peer group. By the end of 2007, CRE loans alone represented 73 percent of the Bank's total loans, while real estate related loans comprised 97 percent. By the end of 2008, Orion's concentration in ADC loans was even more extreme at 433 percent of its total risk-based capital, which was three times the average concentration for its peer group.

30.     As detailed further below, regulators recognized and warned the Defendants about the dangers of the Bank's excessive concentration in CRE and ADC loans, particularly after the South Florida real estate market had begun to decline. They repeatedly advised the Defendants to institute concentration limits and sub-limits in order to protect the Bank against concentration risk. These specific and repeated warnings went ignored, and the Defendants continued to operate the Bank without seriously considering implementing the recommended controls on dangerous loan concentrations.

31.     Ignoring these specific and repeated warnings from regulators, Williams refused to institute concentration limits or sub-limits to rein in the Bank's exposure to any one kind of loan. And despite the Bank's continued concentration in CRE and ADC loans, the Outside Directors did not question this refusal.

C.     The Defendants Ignore the Declining Real Estate Market

32.     The Bank's ADC lending ballooned even as new building permits in its primary business area plummeted by approximately 80 percent between 2005 and 2007.  In other words, the Defendants were exacerbating the Bank's exposure to the real estate market even after they knew or should have known that this market was already sliding into a decline.

## III.     The Defendants Ignore Repeated Warnings from Regulators

33.     The FRB and FOFR conducted regular examinations of the safety and soundness of the Bank.  The regulators documented these examinations in Reports of Examination ("RoEs"), which assigned the Bank a rating between 1 and 5 on each of six factors: Capital, Asset Quality, Management, Earnings, Liquidity, and Sensitivity to Market Risk.  RoEs also assign the Bank a general composite score.  These ratings are commonly referred to collectively as CAMELS ratings.  A score of 1 is the best possible rating, while a score of 5 is the worst.

34.     On March 28, 2007, regulators delivered to the Bank the final RoE for 2006. Regulators criticized the Board's oversight, and recommended that reporting to the Board be improved.  Regulators expressed concerns about the Bank's high concentration in CRE loans, and warned that Bank policy should include CRE limits and sub-limits to reduce concentration risk.  The 2006 RoE also noted that many loans in the Bank's portfolio were supported by outdated appraisals conducted at the peak of the real estate market in 2004 or 2005, and that consequently continued deterioration in the South Florida real estate market exposed the Bank to additional risk.  Regulators were specifically concerned that the Bank's Allowance for Loan and Lease Losses ("ALLL") was underfunded.

35.     The ALLL is an accounting estimate used to reduce the value of loans and leases as assets on the Bank's balance sheet to the amount that the Bank can reasonably expect to

collect. Because the Bank's ability to collect on debt is often dependent on the value of underlying real estate collateral, particularly in CRE and ADC loans, accurate and up-to-date appraisals of such collateral are critical to appropriately valuating the required ALLL. Because Orion's ALLL calculations relied on inaccurate and inflated collateral values, that ALLL materially understated the Bank's expected losses on uncollectible debt.

36.     On August 20, 2008, regulators delivered to the Bank the final 2007 RoE. Significantly, the timing of this examination was accelerated because of regulatory concerns about the rapid decline in the Bank's asset values and escalation in non-performing loans. This RoE again criticized the Board's performance, warning that the Board had not provided adequate oversight of the Bank's lending or increasing credit risk exposure. Regulators assigned the Bank a composite rating of 4, as well as ratings of 4 for every single CAMELS factor except for Sensitivity to Market Risk, for which it received a 3 rating. Regulators again noted the Bank's high concentration in CRE loans and the Bank's failure to institute any policies to reduce or limit that concentration. Regulators also criticized the absence of an independent Chief Credit Officer, noting that the lack of independence undermined the quality of the Bank's underwriting practices.

37.     The examiners also again noted deficiencies with the ALLL, and repeated their warnings about the Bank's reliance on outdated appraisals. Regulators also found that the Bank's ALLL methodology could not reliably estimate the Bank's exposure to loan losses, and created a new process for calculating an appropriate ALLL. Upon applying this new process, the examiners calculated that Orion needed to increase its ALLL by approximately $42 million to bring the ALLL to even a "minimally acceptable level" of approximately $68 million. By way of comparison, Orion had initially calculated its ALLL at the end of 2007 to be $12.4 million,

and then increased it to $25.9 million at the request of the FRB. In other words, regulators had to pressure Orion to increase its ALLL by over 400 percent.

38.     On August 25, 2008, the Bank entered into a Written Agreement with the FRB and FOFR. In this Agreement, the Bank agreed to take certain steps to improve Board oversight, manage its concentration risks, and enhance its lending and credit administration. In particular, regulators had become increasingly concerned that the Defendants were not active enough in carrying out their responsibilities to supervise the Bank's lending. As discussed above, the Written Agreement made clear that the Defendants had up to that point been inadequate in meeting their responsibilities as BLC members. As a result, the Written Agreement specifically required the Defendants to take direct control over the Bank's lending by personally approving and justifying, in writing, any loan to any borrower that had an outstanding loan with the Bank that had been even partly charged off or adversely classified by regulators.

39.     On February 9, 2009, regulators delivered to the Bank the results of a targeted examination focused on the quality of the Bank's assets, which was assigned a 5 rating, the worst possible score. This exam was intended to assess the Bank's progress in addressing concerns raised in the 2007 RoE. This targeted exam evaluated the Bank as either a 4 or 5 rating on each CAMELS factor except for Sensitivity to Market Risk, for which the Bank was again rated as a 3. The RoE noted that the Bank had not adequately responded to recommendations and warnings in the 2007 RoE, and had also failed to fully comply with the August 25, 2008 Written Agreement. Regulators also found that the Bank continued to inaccurately calculate its ALLL, and required the Bank to increase its ALLL provision by at least $26.9 million. As a result of this increase, the Bank's capital position fell from "well-capitalized" to "adequately capitalized" status.

40.     The 2008 RoE, delivered to the Bank on June 12, 2009, did not change any of the CAMELS ratings from the February 2009 targeted examination.  By this time, the Bank's continued viability was in serious question.  Regulators identified the aggressive CRE loan growth strategy instituted by the Defendants and Williams as the cause of the Bank's poor condition, noting that CRE loans represented the majority of the Bank's asset quality problems. Regulators also again criticized the Bank's continued failure to retain an independent Chief Credit Officer.

41.     The 2009 RoE, delivered to the Bank on July 9, 2009, gave the Bank a composite 5 rating, the worst possible score.  This RoE criticized the Bank's continued failure to manage its CRE concentration risk and to otherwise respond to regulatory warnings and recommendations. By this point, the consequences of the aggressive CRE loan growth strategy lay fully exposed, and the Bank's survival was doubtful.  Unsurprisingly, the Bank failed four months later.

42.     In short, by at least August 20, 2008, regulators had issued unmistakable warnings and recommendations to the Defendants about the dangerous loan concentrations and ineffective underwriting that eventually brought down the Bank.  And by August 25, 2008, the Written Agreement had laid upon the Defendants heightened and extremely specific obligations as BLC members, and made clear that meaningful and vigorous directorial oversight was critical to preserving the viability of the Bank.

## IV.     The Defendants Blindly Approve Millions of Dollars in Loans

### A.     The Bank Begins Lending to Frank Mileto

43.     In late 2006, Francesco "Frank" Mileto ("Mileto") became a customer of the Bank.  Mileto presented himself as a long-term real estate investor with tremendous and liquid

personal wealth. The purported source of this wealth was over $6 million in annual distributions from an Italian family trust of which Mileto was a beneficiary.

44.     From its inception, the Bank's relationship with Mileto exemplified the casual disregard for the requirements of the Bank's loan policy and basic principles of prudent underwriting that the Defendants had permitted to pervade the Bank's lending culture.  For example, although the Bank's loan policy required the Bank's officers to verify assets that borrowers listed on financial statements, by February 2008, officers of the Bank had approved and funded over $6 million in two loans to Mileto without conducting a meaningful investigation into or attempt at verification of Mileto's representations as to his enormous personal wealth.

45.     By June 2008, the Bank was already struggling under the weight of the excessively large and risky loans that had been extended under what had become the Bank's routinely deficient underwriting.   Of particular concern was nearly $15 million in outstanding debt that was owed to the Bank by an entity headed by Scott Brenner ("Brenner Loan"), and which was increasingly unlikely to ever be repaid.

46.     Williams was desperate to avoid recognizing the staggering expected losses from the Brenner Loan in the Bank's financial statements.   When Mileto expressed interest in obtaining financing from the Bank to purchase problem loans from the Bank in "note-sale workout" transactions, Williams saw an opportunity to artificially inflate the Bank's apparent financial strength.  Accordingly, on June 25, 2008, Williams approved a $14.995 million loan to Centurion Capital Fund L, LLC ("June 2008 Centurion Loan"), and a $2 million line of credit to Centurion Property Management Group I, LLC ("June 2008 Centurion LOC" and, together with the June 2008 Centurion Loan, the "June 2008 Centurion Transactions").  Both borrowers were entities owned and controlled by Mileto, and Mileto personally guaranteed both obligations, but

neither Williams nor any other Bank officer took any meaningful steps to investigate or verify Mileto's financial capacity before closing the loans. The June 2008 Centurion Loan was intended to fund Mileto's purchase of the Brenner Loan, and required Mileto to contribute $150,000 of his own money towards the purchase. Mileto ignored this provision and instead used proceeds from the June 2008 Centurion LOC to fund his contribution. As a result, the Bank financed the entire purchase price.

      B.      The Defendants Rubberstamp Additional Note-Sale Workout Transactions with Mileto

          1.      The November 2008 Centurion Transactions

47.      On November 19, 2008, each of the Defendants, as members of the BLC, grossly negligently joined Williams to approve a $15 million guidance line of credit for Centurion Capital XV, LLC ("November 2008 Centurion GL"), and a $5.5 million line of credit to Centurion Capital Fund I, LLC ("November 2008 Centurion LOC" and together with the November 2008 Centurion GL, "November 2008 Centurion Transactions"). Both borrowers were entities owned and controlled by Mileto.

48.      Like the June 2008 Centurion Transactions, the November 2008 Centurion Transactions were note-sale workout transactions. The November 2008 Centurion GL permitted the Bank's officers to finance Mileto's purchases of problem loans up to $15 million, and was purportedly intended to fund only 90 percent of the purchase price of certain problem notes. Mileto was supposed to contribute his own money towards the note purchases and provide a 10 percent equity contribution towards those purchases. But, just as with the June 2008 Centurion Transactions, Mileto and Orion ignored this provision. Instead, Mileto was permitted to fund his supposed equity contribution with proceeds from the November 2008 Centurion LOC. In other words, the Bank once again paid Mileto millions of dollars for nothing but the privilege of using

his name to create the illusion that nonperforming loans on the Bank's balance sheets had been replaced by new and performing loans.

49.     As detailed above, by this time, the Defendants had come under repeated criticism from regulators because of their unwillingness to exercise meaningful oversight over Williams. Regulators had specifically criticized the Bank's credit risk management, its high concentration in CRE and ADC loans, and its handling of problem loans. The Bank had also entered into the Written Agreement with the FRB and FOFR that specifically required the Defendants to exercise more direct supervision over the Bank's lending by personally approving all loans to borrowers with troubled loans outstanding. Moreover, the November 2008 Centurion Transactions increased Orion's credit exposure to Mileto to over 15 percent of Orion's capital, and therefore required the Defendants' direct approval under Orion's own policies as well. Under these sets of circumstances, the Defendants should have been particularly diligent in reviewing and independently evaluating loans prior to granting their approval.

50.     Unfortunately for the Bank, the Defendants continued to simply rubberstamp proposed loans. Board minutes reflect that the BLC approved the November 2008 Centurion Transactions during the November 19, 2008 meeting of the Bank's Board of Directors, but do not contain any evidence that any Defendant exercised any judgment before approving the loans. Minutes do not record the Defendants asking any questions about Mileto even though the proposed loans took the Bank to its legal lending limit with respect to Mileto. There is also no evidence that any Defendant asked why Mileto was willing to purchase nonperforming loans for full or close to full value. In fact, there is no evidence in the minutes to show that any Defendant asked even a single question before approving the November 2008 Centurion Transactions.

Rather, minutes simply state that the loan requests were "reviewed,' motions to approve them made and seconded, and then "approved unanimously."

51.     The Defendants' failure to scrutinize the November 2008 Centurion Transactions before approving them was not an exception, but the rule.  Significantly, the BLC approved over $78 million in 17 loans during the same meeting, but the minutes do not document any BLC member asking any questions about any loan during that meeting.

52.     Moreover, the Defendants had a duty to adequately inform themselves about the November 2008 Centurion Transactions before granting approval.  The Written Agreement with regulators had emphasized the Defendants' responsibilities to ensure they received adequate information about proposed loans by specifically requiring the Defendants to certify that "all necessary loan documentation ha[d] been properly and accurately filed" when approving any loan to any borrower with an outstanding troubled loan.  Each Defendant was therefore responsible for ensuring that he obtained sufficient and accurate information to support a credit decision before approving a loan.  Significantly, to the extent that the Defendants actually evaluated and approved the November 2008 Centurion Transactions rather than passively following Williams's lead, they relied on Mileto's flawed and unverified financial information, which had supported the June 2008 Centurion Transactions.  The Defendants never inquired as to whether anyone at the Bank had verified Mileto's financial information, and instead simply assumed it was true.  By relying on such obviously deficient information, the Defendants failed to meet their obligation to adequately inform themselves about the proposed loan.

53.     The November 2008 Centurion Transactions ultimately financed Mileto's purchase of seven problem loans for a total of $14,510,000.  Because Mileto used the November 2008 Centurion LOC to fund his "equity" contribution in the problem note purchases, the Bank

financed the entire purchase price of each problem loan, which was a violation of Orion's loan policy, and the terms and conditions that the Defendants had approved with respect to the November 2008 Centurion GL.

54.     The Bank suffered a loss because of the Defendants' gross negligence, and/or breaches of fiduciary duties with respect to these loans in an amount to be determined by the jury, but at this time estimated to be approximately $14.723 million.  The loss from the November 2008 Centurion GL is estimated at $9.223 million, and the loss from the November 2008 Centurion LOC is estimated at $5.5 million.

        2.      The Southeast Retail/Florida Metro Transactions

55.     By June 2009, the Bank was in serious financial distress, and its continued survival in serious doubt.  As discussed above, by this time, regulators had rated the Bank as a composite CAMELS 4, or the second lowest rating, for approximately ten months, and in February 2009, had rated the Bank's asset quality specifically as a 5, the lowest possible score. Also in February 2009, regulators had required the Bank to increase its ALLL provision by over $25 million, which had in turn caused the Bank's capital position to fall from "well-capitalized" to "adequately capitalized."

56.     Given the above, the Defendants were well aware of the Bank's increasingly precarious position, and knew or should have known that active and vigorous Board oversight was similarly increasingly critical to the Bank's viability.  As stated above, the Defendants had even assumed specific obligations with respect to loan approvals pursuant to the Written Agreement executed on August 25, 2008.

57.     It was in this context, *i.e.*, one that demanded heightened Board supervision, which the Defendants met as members of the BLC on June 17, 2009.  On that date, the

Defendants were presented with requests for approval of $82 million in four loans to two Mileto-controlled entities, Southeast Retail Portfolio One, LLC ("SE Retail") and Florida Metro One, LLC ("Florida Metro"). Both SE Retail and Florida Metro were entities set up specifically for these loans. Florida Metro was solely managed by Mileto's nephew, Jeremy Womack ("Womack"). SE Retail was solely managed by Mileto's attorney, Daniel Marzano ("Marzano"). These loans were structured as a $29 million guidance line loan ("SE Retail GL") and $12 million line of credit ("SE Retail LOC" and together with the SE Retail GL, "SE Retail Transactions") for SE Retail, and a $26.5 million guidance line loan ("Florida Metro GL") and $14.5 million line of credit ("Florida Metro LOC" and together with the Florida Metro GL, the "Florida Metro Transactions") for Florida Metro.

58.     The SE Retail GL and Florida Metro GL were both intended to finance Mileto's purchase of certain problem loans from the Bank. Like the November 2008 Centurion GL, the SE Retail GL and Florida Metro GL were intended to fund 90 percent of the purchase price of certain problem notes, and were structured to require that Mileto provide a 10 percent equity contribution towards those purchases. As he had in the June 2008 and November 2008 Centurion Transactions, Mileto ignored the relevant provisions and funded his supposed equity contributions with proceeds from the SE Retail LOC and Florida Metro LOC. The end result was that the Bank yet again paid Mileto millions of dollars for nothing but the privilege of using his name to replace nonperforming loans on the Bank's balance sheets with nominally new and performing loans

59.     The SE Retail and Florida Metro Transactions should have attracted immediate and searching scrutiny by the Defendants. Both sets of transactions were literally as large as legally possible, as each took the Bank instantaneously to its legal lending with respect to SE

Retail and Florida Metro. Moreover, each of the borrower entities was newly formed specifically for these transactions, and consequently lacked any financial history to evidence sufficient capacity to repay such a sizeable debt. And because neither Womack nor Marzano, the purported principals of Florida Metro and SE Retail, respectively, personally guaranteed the loans, the Bank could enforce repayment only against these new and unproven borrower entities. In fact, the Bank had no established and reliable source of repayment other than the $7 million Bank of America Certificate of Deposit that was to secure the SE Retail and Florida Metro LOCs.

60.     There is no evidence that the Defendants meaningfully reviewed and/or evaluated the SE Retail and Florida Metro Transactions before approving them. There is no record that any Defendant asked any questions about the transactions, such as whether the financial information had been verified, or why two $41 million loans to newly formed entities were unsupported by personal guarantees. In fact, there is no record that the Defendants ever meaningfully discussed the SE Retail and/or Florida Metro Transactions at all. On the contrary, on June 17, 2009, the Defendants unanimously approved over $70 million in 21 separate loans in a mere 80 minutes (Defendant Schmitt was the borrower on one of the 21 loans approved at that meeting, and did not vote on that loan). Significantly, minutes do not reflect that any Defendant asked any question about or otherwise meaningfully discussed any of those 21 loans before approving each and every one after "deliberating" for an average of under four minutes.

61.     After June 17, 2009, Mileto refused to agree to the SE Retail and Florida Metro Transactions under the terms that the Defendants had initially approved. Consequently, on June 29, 2009, those transactions were submitted to the Defendants for their ratification of modifications to the terms. The most significant modification was that the LOCs were no longer

to be secured by a $7 million Bank of America Certificate of Deposit. Instead, the LOCs would be secured only by the "[a]ssignment of ownership interest against equity real estate assets."

62.     Significantly, the Credit Approval Requests approved by the Defendants did not specify what kind of ownership interest would secure the LOCs. Moreover, the Requests also did not -- indeed, could not -- assess the value of the vaguely identified "ownership interest," even though it purported to limit the loan-to-value ratio for the LOCs to 75 percent.

63.     Incredibly, no Defendant ever asked why the $7 million Bank of America Certificate of Deposit would no longer secure the LOCs, or questioned the wisdom of substituting guaranteed and liquid collateral with unspecified and unvalued ownership interests in real estate. Rather, exactly as they had on June 17, 2009, the Defendants unanimously approved the SE Retail and Florida Metro Transactions as modified without first meaningfully reviewing or evaluating those loans. If anything, on June 29, 2009, the Defendants exhibited an even more egregious disregard for their duty to inform themselves by approving over $140 million in 20 separate loans in roughly 60 minutes. Again, minutes do not reflect that any Defendant asked any question about or otherwise meaningfully discussed any one of those 20 loans before approving each and every one after "deliberating" for an average of roughly three minutes.

64.     The Bank suffered losses because of the Defendants' gross negligence, and/or breaches of fiduciary duties with respect to the SE Retail and Florida Metro Loans in an amount to be determined by the jury, but at this time estimated to total approximately $39.017 million. The losses on the SE Retail LOC and SE Retail GL are estimated at $12 million and $3.7 million respectively. The losses on the Florida Metro LOC and GL are estimated at $8.817 million and $14.5 million respectively.

## V.    The Bank Collapses

65.     Orion's asset quality slid into a sharp and accelerating decline by the end of 2008.
Between September 30, 2008 and December 31, 2008, the Bank's adversely classified assets
jumped from approximately 181 percent to 257 percent of the sum of tier 1 capital and the
allowance for loan and lease losses.  By December 31, 2008, the Bank's past due and nonaccrual
loans represented nearly 10 percent of the Bank's loans.

66.     On September 1, 2009, the Bank learned that, despite a June 2009 capital
infusion, it still did not qualify for "Well Capitalized" status after certain errors in the June 2009
Call Report were corrected.  On October 19, 2009, FOFR notified Orion that it was considered
"imminently insolvent," and requested that the Board consent to the appointment of the FDIC as
receiver at a date to be appointed.  By October 26, 2009, the FRB had notified the Bank that it
was considered critically capitalized after its ratio of tangible equity to total assets fell to 1.42
percent.

67.     By November 9, 2009, regulators had uncovered the illegality behind the June
capital infusion that had temporarily revived the Bank.  On that date, the FRB issued a Prompt
Corrective Action directive requiring the dismissal of Williams from the Bank.  On November
13, 2009, FOFR closed Orion and appointed the FDIC as receiver.

## CLAIMS FOR RELIEF

### Count I
### Grossly Negligent Failure to Adequately Supervise the
### Bank's Lending - Breach of Duty of Care
### (Against All Defendants)

68.     The FDIC-R incorporates by reference each of the allegations in paragraphs 1 through 67 of this complaint.

69.     Each of the Defendants, as directors of the Bank, owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in the management, supervision and conduct of the Bank's business and financial affairs.

70.     By their actions and inactions, as described specifically and generally herein, each of the Defendants failed and neglected to perform their respective duties as directors of the Bank, constituting breaches of their statutory and common law duties of care owed to the Bank.

71.     By way of example, and not of limitation, the Defendants instituted and/or permitted the Bank to pursue an excessively risky and aggressive growth strategy that was characterized by the accumulation of excessive concentrations in CRE and ADC loans and disregard for prudent risk management and underwriting.

72.     Moreover, the Defendants knowingly devoted grossly inadequate attention and effort towards meeting their responsibilities as directors of the Bank, which constituted an utter failure to even attempt to meet the requisite standard of care.

73.     By at least August 20, 2008, when the Defendants learned that regulators had rated the Bank as a composite 4, including a 4 for management, the Defendants were aware that their oversight of the Bank was deficient.  Therefore, by at least August 20, 2008, the Defendants

were grossly negligent in failing to institute effective internal controls to ensure that the Bank's lending complied with principles of prudent underwriting and risk management.

74.    As a direct and proximate result of the grossly negligent acts and omissions of the Defendants, the Bank suffered damage and sustained losses in an amount to be proven at trial, which, upon information and belief, exceeds $53 million.

**Count II**
**Grossly Negligent Direct Approval of Obviously Risky Loans - Breach of Duty of Care**
**(Against All Defendants)**

75.    The FDIC-R incorporates by reference each of the allegations in paragraphs 1 through 67 of this complaint.

76.    Each of the Defendants, as directors of the Bank and members of the Bank's BLC, owed the Bank the obligation to exercise the degree of diligence, care, and skill which ordinarily prudent persons in like positions would exercise under similar circumstances in the management, supervision and conduct of the Bank's business and financial affairs.

77.    In particular, the Defendants owed the Bank a duty to inform themselves about, and then carefully evaluate, loans presented to them for their approval as members of the BLC.

78.    By personally approving loans after only grossly and obviously inadequate review and despite obvious underwriting deficiencies, as described more fully in this complaint, the Defendants exhibited a lack of care going beyond ordinary negligence and reaching gross negligence.

79.    As a direct and proximate result of the grossly negligent acts and omissions of each Defendant named in this count, the Bank suffered damage and sustained losses in an amount to be proved at trial, which, upon information and belief, exceeds $53 million.

## **PRAYER FOR RELIEF**

WHEREFORE, the FDIC-R respectfully prays for relief as follows:

1.      Judgment for at least $53 million against Defendants Aultman, Holland, Pratt, and

Schmitt, jointly and severally, on Count I of this complaint;

2.      Judgment for at least $53 million against Defendants Aultman, Holland, Pratt, and

Schmitt, jointly and severally, on Count II of this complaint;

3.      All costs incurred for the investigation, filing and litigation against all

Defendants.

4.      Reasonable attorneys' fees, plus pre and post judgment prevailing legal interest

against all Defendants; and

5.      For such other and further relief as this Court deems just and proper.


RESPECTFULLY SUBMITTED.

In Miami, Florida, this 28th day of January, 2013.

Aviva L. Wernick, Esq. (Florida Bar # 697281)
wernick@hugheshubbard.com
Dennis S. Klein (Florida Bar # 91767)
klein@hugheshubbard.com
Trial Counsel for the FDIC-R
Hughes Hubbard & Reed LLP
201 S Biscayne Blvd.
Suite 2500
Miami, FL 33131-4305
Tel. 305-358-1666
Fax. 305-371-8759

61968408_4